IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

Esperanza Guerrero, et al.,      )
                                 )
      Plaintiffs,                )
                                 )
          v.                     )      1:09cv1313 (JCC/TRJ)
                                 )
Charlie T. Deane, et al.,        )
                                 )
      Defendants.                )
                                 )

**M E M O R A N D U M   O P I N I O N**

        This matter is before the Court on Defendants'
Motion to Dismiss or, in the Alternative, for Summary Judgment.
For the following reasons, the Court will grant in part and deny
in part Defendants' Motion to Dismiss pursuant to Federal Rule of
Civil Procedure 12(b)(6).

### I. Background

        This case arises out of an alleged instance of police
officers' unlawful entry into the home of the Guerrero family in
their effort to serve a truancy summons, use of excessive
physical force to restrain and arrest Mr. and Mrs. Guerrero, and
the false arrest and imprisonment of Mr. and Mrs. Guerrero.  On
November 20, 2009, Plaintiffs Esperanza Guerrero ("Mrs.
Guerrero"), Juan Guerrero ("Mr. Guerrero") (collectively "the
Guerreros"), Maria Munguia ("Maria Munguia"), and Mr. and Mrs.

1

Guerrero's minor children JJG, MG, JG, and KG (collectively "Plaintiffs") together filed a complaint (the "Complaint") against the Prince William County Police Department (the "PWCPD"), Price William County ("PWC"), Charlie Deane, the Chief of the PWCPD ("Chief Deane"), Officers David L. Moore ("Officer Moore"), Luis Potes ("Officer Potes"), Adam Hurley ("Officer Hurley") and unidentified PWCPD Officers DOES 1-6 and ROES 1-5 (collectively "Defendants.")

The allegations in the Complaint are as follows. Plaintiffs Juan and Esperanza Guerrero are husband and wife who reside in Prince William County, Virginia. (Compl. ¶ 6.) Mr. and Mrs. Guerrero live with their four minor children JJG, MG, JG, and KG as well as Mrs. Guerrero's elderly mother, Maria Munguia. (Compl. ¶ 6.) On November 24, 2007, at about 11:30 a.m., Mr. and Mrs. Guerrero and their nephews R. Munguia and A. Munguia were at the Guerrero home located in Prince William County, Virginia. (Compl. ¶ 19.) At this time, Mrs. Guerrero heard a knock at the door and found Officer Moore at her doorstep when she opened the door. (Compl. ¶ 20.) Officer Moore asked Mrs. Guerrero if he could speak with Antonia Munguia. (Compl. ¶ 21.) Antonia Munguia is Mrs. Guerrero's sister and also the mother of R. Munguia and A. Munguia. (Compl. ¶ 21.) Mrs. Guerrero informed Officer Moore that Antonia Munguia did not live at the residence but would happily take his business card.

(Compl. ¶ 22.)  In response, Officer Moore "began twirling one hand in the air" while keeping the other hand behind his back as if he was reaching for his handcuffs and told her that his business was that he was the police.  (Compl. ¶ 23.)  Officer Moore neither explained to Mrs. Guerrero why he was looking for Antonia Munguia nor did he produce any supporting documentation for the visit.  (Compl. ¶ 23.)  He never asked Mrs. Guerrero for her identification.  (Compl. ¶ 23.)

At this point, Mrs. Guerrero attempted to close the door on him and Officer Moore wedged his foot in the doorway.  (Compl. ¶ 24.)  Mrs. Guerrero tried to shut the door with her right knee but Officer Moore continued to push his way into home and this action bruised her knee.  (Compl. ¶ 24.)  In response to Officer Moore's action, Mrs. Guerrero asked him: "What are you doing?  This is my house!"  (Compl. ¶ 25.)  Officer Moore attempted to pull Mrs. Guerrero out of the house by her left arm which resulted in bruising to her arm, shoulder and right knee.  (Compl. ¶ 25.)  Officer Moore also attempted to put her in a headlock.  (Compl. ¶ 25.)  At this point, Officer Moore told Mrs. Guerrero that she was under arrest for assault and battery of a police officer.  (Compl. ¶ 25.)

During this time, one of the Guerrero children, JG, came downstairs, saw the altercation between Mrs. Guerrero and Officer Moore, and began to cry.  (Compl. ¶ 26.)  Maria Munguia

and the rest of the Guerrero children, JJG, MG, and KG, also came into the foyer and started to cry. (Compl. ¶ 26.) Officer Moore continued his effort to pull Mrs. Guerrero out of the house or to push his way into the house. (Compl. ¶ 27.) At one point, Mrs. Guerrero said to him that if he thought they were illegal, they were not. (Compl. ¶ 27.) At this time, Mr. Guerrero, who was upstairs watching the television, heard the altercation, walked to the top of the stairs from which he could see Officer Moore trying to push his way into the home and grabbing Mrs. Guerrero. (Compl. ¶ 28.) Mr. Guerrero came downstairs and asked Mrs. Guerrero what was happening. (Compl. ¶ 29.) Mrs. Guerrero told him in Spanish that she thought Officer Moore may have mistaken her for Antonia Munguia. (Compl. ¶ 29.) Mr. Guerrero asked Officer Moore, in English, if he needed to see Mrs. Guerrero's identification and ran to the kitchen to find it. (Compl. ¶ 29.)

During the altercation, one of the children, a 14 year old MG, ran to call the police and was still on the phone when three other officers -- Officer Potes, Officer Hurley and an unidentified officer -- arrived at the scene. (Compl. ¶¶ 26, 30.) These three officers and Officer Moore together pushed their way through the door into the house. (Compl. ¶ 31.) When they pushed their way in, Mrs. Guerrero fell to the ground hitting the nearby steps and suffered injury to her shoulder and elbow. (Compl. ¶ 31.) Officer Moore exacerbated her injuries

when he forcibly held her to the ground.  (Compl. ¶ 31.)

The four children began screaming when this happened and Mr. Guerrero quickly returned from the kitchen.  (Compl. ¶ 31.)  None of the officers displayed their weapons but "within a split second of the officers entering the home," Officer Potes sprayed Mr. Guerrero in the face with the pepper spray.  (Compl. ¶ 32.)  Mr. Guerrero stumbled back to the kitchen with pain in his eyes.  (Compl. ¶ 33.)  Officer Potes then pointed the pepper spray at Maria Munguia, who was simply asking what happened, until one of the children informed him that she was elderly.  (Compl. ¶ 34.)  Officer Potes also pointed the pepper spray at Mrs. Guerrero but was told by Officer Moore not to spray her because Officer Moore was already holding her to the ground.  (Compl. ¶ 35.)  At this time, Officer Moore told Mrs. Guerrero that she was under arrest for assault and battery then handcuffed her.  (Compl. ¶ 35.)

Officer Moore dragged Mrs. Guerrero out of her house and walked her to his squad car.  (Compl. ¶ 36.)  When Mrs. Guerrero asked Officer Moore whether he had a warrant, he told her he had "something" but did not elaborate what it was or show her the document.  (Compl. ¶ 39.)  When she asked him why he would not tell her, he did not respond.  (Compl. ¶ 39.)  At this point, a female officer searched Mrs. Guerrero and put her in the back of the squad car.  (Compl. ¶ 39.)  Mr. Guerrero was also

arrested by another officer and was taken out of the house in handcuffs. (Compl. ¶ 36.) Mr. Guerrero waited outside for an ambulance for more than thirty minutes not knowing why he was under arrest. (Compl. ¶ 38.) Once Mrs. Guerrero was in the squad car, Officer Moore asked the female officer in the car to tighten her handcuffs. (Compl. ¶ 40.) When the female officer tightened the handcuffs, Mrs. Guerrero suffered cuts on her left hand. (Compl. ¶ 40.) When they arrived at the police station, Officer Moore instructed Mrs. Guerrero to lean back so he could unbuckle her seatbelt. (Compl. ¶ 41.) Even though Mrs. Guerrero told Officer Moore that the handcuffs were hurting her hands, Officer Moore instructed her to lean back even further. (Compl. ¶ 41.)

Once Mrs. Guerrero arrived at the police station, she was finally shown a truancy summons for Antonia Munguia, the execution of which was the sole reason for Officer Moore's visit to the Guerrero home. (Compl. ¶ 42.) At the police station, Mrs. Guerrero showed her injuries to an Internal Affairs Officer who examined her left side from the elbow to her finger. (Compl. ¶¶ 43-44.) He, however, refused to examine her shoulder. (Compl. ¶ 44.) After the examination, he asked her to sign a waiver which stated that she did not need any medical treatment. (Compl. ¶ 45.) She insisted that she needed to see a doctor and refused to sign the waiver. (Compl. ¶ 45.) In response, several

officers told her that they would not take her to a doctor thereby refusing her medical treatment. (Compl. ¶ 46.) Mrs. Guerrero was detained at the station for the remainder of the day, spent a day in a jail cell the next day, and was released on the morning of the third day. (Compl. ¶ 47.) Mr. Guerrero was released on the same day at night on bond. (Compl. ¶ 48.) The four children were home with Maria Munguia during this time.

Based on the altercation which took place during Officer Moore's visit, Mrs. Guerrero was charged with assault and battery of a law enforcement officer and obstruction of justice. (Compl. ¶ 49.) On January 25, 2008, the Honorable Wenda K. Travers in the General District Court of Prince William County found Mrs. Guerrero not guilty on the obstruction of justice charge because the evidence indicated that "the entry [by Officer Moore into the Guerrero home] was unlawful." (Compl. ¶ 49.) Judge Travers also struck the charges of assault and battery. (Compl. ¶ 49.) Mr. Guerrero was charged with obstruction of justice without threat or force. He was found not guilty of that charge on March 4, 2008 in the General District Court of Prince William County. (Compl. ¶ 50.)

As a result of this incident, Mrs. Guerrero's left shoulder, left elbow, and right knee were bruised. (Compl. ¶ 51.) Her wrist was also scratched and cut. (Compl. ¶ 51.) Mr. Guerrero's right eye remains impaired from being pepper

sprayed and he suffered from depression for a month following the incident.  (Compl. ¶ 52.)  Since the incident, KG is scared to open the door when strangers come to their home and JG becomes fearful when he sees a police officer.  (Compl. ¶¶ 53-54.)  JG, moreover, was very sad following the incident and often asked his mom if police were coming back.  (Compl. ¶ 54.)  Plaintiffs all suffered humiliation when their neighbors gathered outside and witnessed the incident.  (Compl. ¶ 55.)  JJG, MG and KG suffered humiliation and shame when their friends repeatedly asked them about the incident at school.  (Compl. ¶ 55.)

The Complaint contains the following seven causes of action: (1) unreasonable searches and seizures in violation of the Fourth Amendment to the United States Constitution against all Defendants; (2) excessive use of force in violation of the Fourth Amendment to the United States Constitution against Defendants Deane, Moore, and Potes; (3) assault under Va. Code Ann. § 18.2-57 against Defendants DOES, ROES, Moore and Potes; (4) battery under Va. Code Ann. § 18.2-57 against Defendants DOES, ROES, Moore and Potes; (5) false arrest and imprisonment against Defendants DOES, ROES, Moore, Potes, and Hurley; (6) intentional infliction of emotional distress against all Defendants; and (7) negligent infliction of emotional distress

against all Defendants.[1]  (Compl. ¶¶ 56-84.)  Plaintiffs seek a

declaratory judgment, compensatory, nominal, special, statutory

and punitive damages, attorney's fees, and any other relief the

Court deems just and proper.

On December 14, 2009, Defendants filed a Motion to

Dismiss, or in the alternative, for Summary Judgment.  Defendants

included various records and affidavits by the police officers

involved in the alleged incidents in support of their Motion.

Plaintiffs filed their Opposition on December 28, 2009 and

Defendants submitted their Reply on January 4, 2010.  The oral

argument took place on January 15, 2010.  Defendants' Motion to

Dismiss, or in the alternative, for Summary Judgment is before

the Court.

## II.  Standard of Review

A Rule 12(b)(6) motion to dismiss tests the legal

sufficiency of a complaint.  *See Randall v. United States*, 30

F.3d 518, 522 (4th Cir. 1994) (citation omitted).  In deciding a

Rule 12(b)(6) motion to dismiss, the Court is first mindful of

---

[1] The Court notes that the above mentioned Defendants for each cause of action in this Opinion are the Defendants whom Plaintiffs identified in the headings for each cause of action in the Complaint.  However, Plaintiffs' counsel indicated clearly during the oral argument that all causes of action are also brought against Chief Deane.  Plaintiffs also stated during the oral argument that they intend to amend the Complaint to reflect the names of the officers whose identity is now known but was unknown at the time of the filing of the Complaint.  Thus, the Court orders Plaintiffs to file an Amended Complaint (1) identifying clearly in the headings for each cause of action which Defendants are being sued for which cause of action and in what capacity; and (2) identifying who officer DOES and ROES are, as soon as practicable.

the liberal pleading standards under Rule 8, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Thus, the Court takes "the material allegations of the complaint" as admitted and liberally construe the Complaint in favor of Plaintiffs. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) (citation omitted). While Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions" because "a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citation omitted). Indeed, the legal framework of the Complaint must be supported by factual allegations that "raise a right to relief above the speculative level." *Id.* at 1965.

In *Ashcroft v. Iqbal*, 129 S.Ct 1937 (2009), the Supreme Court expanded upon *Twombly* by articulating the two-pronged analytical approach to be followed in any Rule 12(b)(6) test. First, a court must identify and reject legal conclusions unsupported by factual allegations because they are not entitled to the presumption of truth. *Id.* at 1951. "[B]are assertions" that amount to nothing more than a "formulaic recitation of the elements" do not suffice. *Id.* (citations omitted). Second, assuming the veracity of "well-pleaded factual allegations," a

court must conduct a "context-specific" analysis drawing on "its judicial experience and common sense" and determine whether the factual allegations "plausibly suggest an entitlement to relief." *Id.* at 1950-51. The plausibility standard requires more than a showing of "a sheer possibility that a defendant has acted unlawfully." *Id.* at 1949. In other words, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949.

Along with their Motion to Dismiss, Defendants submitted affidavits from certain police officers and other relevant records as their exhibits in support of the motion. If the Court chooses to consider these documents attached to Defendants' Motion, then Rule 12(d) of Federal Rules of Civil Procedure requires the Court to treat the motion "as one for summary judgment under Rule 56," in which case "[a]ll parties must be given a *reasonable opportunity* to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d) (emphasis added); *see also Plante v. Shivar*, 540 F.2d 1233, 1235 (4th Cir. 1976).

The Fourth Circuit has held that the term "reasonable opportunity" requires that the parties are given "some indication by the court . . . that it is treating the 12(b)(6) motion as a motion for summary judgment, with the consequent right in the

opposing party to file counter affidavits or to pursue reasonable discovery." *Johnson v. RAC Corp.*, 491 F.2d 510, 513 (4th Cir. 1974) (internal quotation omitted).  The Court can assume that a party is on notice regarding the possibility of conversion "[w]hen a party is aware that material outside the pleadings is before the [C]ourt." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (internal citations omitted).  However, notice alone is not enough.  In addition to notice, a party must be afforded a "reasonable opportunity for discovery" before a Rule 12(b)(6) motion may be converted and summary judgment granted.  *RAC Corp.*, 491 F.2d at 515.

In this case, Plaintiffs were not yet afforded a reasonable opportunity for discovery.  The Court finds that converting Defendants' Rule 12(b)(6) motion to a Rule 56 motion, before allowing any discovery by Plaintiffs, is premature and inappropriate at this juncture.  *See Gay*, 761 F.2d at 178 (holding that the district court's conversion of a motion to dismiss to a motion for summary judgment without affording a party a reasonable opportunity for reasonable discovery was an abuse of discretion).  The Court's ruling on Defendants' Motion to Dismiss will define the scope of the remaining factual issues while allowing the parties adequate amount of time to discover evidence in preparation for summary judgment and trial.  For these reasons, the Court will treat Defendants' Motion to

Dismiss, or in the alternative, for Summary Judgment, strictly as a Motion to Dismiss pursuant to Rule 12(b)(6).

### III. Analysis

Defendants submit that Plaintiffs' Complaint should be dismissed for a number of reasons, including, among others, qualified immunity, sovereign immunity, and contributory negligence.  The Court will address each argument in turn.

A. Qualified Immunity

Qualified immunity protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity provides "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

In *Saucier v. Katz*, the Supreme Court proposed a two-prong inquiry for a district court to use when determining whether the defense of qualified immunity would apply.  533 U.S. 194, 201-02 (2001).  First, a district court determines whether, "[t]aken in the light most favorable to the party asserting the injury," the facts alleged by that party "show the officer's

conduct violated a constitutional right." *Id.* at 201. If a constitutional violation did occur, the court then explores "whether the right was clearly established." *Id.* at 202. A right is clearly established if "its contours [is] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (internal quotation marks omitted). In making this second inquiry, the court "ascertain[s] 'whether a reasonable [official] could have believed [the challenged conduct] to be lawful, in light of clearly established law.'" *Meeker v. Edmundson*, 415 F.3d 317, 323 (4th Cir. 2005) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

The Court notes that the sequence of the two-step inquiry required by *Saucier* is no longer mandatory. *Pearson v. Callahan*, 129 S. Ct. 808, 817 (2009). Thus, the Court is "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818. With this in mind, the Court now addresses the allegations of constitutional violations in the Complaint.

<u>a. Count I (Unreasonable Searches and Seizures); Count V</u>

<u>(False Arrest and Imprisonment)</u>[2]

Count I of the Complaint, for unreasonable searches and seizures, is directed against all Defendants in the action. Count V of the Complaint, for false arrest and imprisonment, is directed against Officers Moore, Potes, Hurley, DOES and ROES and Chief Deane.[3]  Both claims turn on whether the police officers involved in the incident had a valid search or arrest warrant, if not, had probable cause to seize and arrest Mr. and Mrs. Guerrero.

The Fourth Amendment forbids unreasonable searches and seizures.  U.S. Const. Amend. IV.  "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980).  Thus, "[i]n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the

---

[2] Though Plaintiffs' false arrest and false imprisonment claims are state law claims, the Court concludes that both are essentially claims alleging a seizure of the person in violation of the Fourth Amendment to which qualified immunity defense would apply.  *See Rogers v. Pendleton*, 249 F.3d 279, 294 (4th Cir. 2001); *see also DeChene v. Smallwood*, 226 Va. 475, 479 (Va. 1984) (applying the qualified immunity analysis and holding that it is settled Virginia law that an officer cannot be found liable for false imprisonment if he acted in good faith and with reasonable belief in the validity of the arrest).

[3] Based on Plaintiffs' counsel's statement during the oral argument, the Court will assume that Count V is also brought against Chief Deane in addition to other named officers in the Complaint.

house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."  *Id.* at 590.

### i.  Unreasonable Searches

In Count I (unreasonable searches and seizures) of the Complaint, Plaintiffs first allege that Officers Moore, Potes, Hurley and DOE "unlawfully entered the Plaintiffs' home without a [search or arrest] warrant, and without the presence of exigent circumstances" thereby violating the Fourth Amendment.  (Compl. ¶ 59.)  The Supreme Court in *Payton* held that only when a law enforcement officer has a valid arrest warrant founded on probable cause, he will have "the limited authority to enter [the suspect's] dwelling *. . .* when there is reason to believe the suspect is within."  *Payton*, 445 U.S. at 603.  However, the holding in *Payton* is not applicable directly here because there is no allegation in the Complaint that the Guerrero residence was, in fact, Antonia Munguia's residence.  *See Wallace v. King,* 626 F.2d 1157, 1161 (4th Cir.1980) (quoting *Payton,* 445 U.S. at 603, 100 S.Ct. 1371) (noting that *Payton* was "specifically limited to the 'dwelling in which the suspect lives.'")

Thus, the Court finds the Supreme Court's holding in *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) -- that a law enforcement officer may not enter a *third-party* residence to effectuate a subject's arrest without

a search warrant, consent of the owner of the residence, or exigent circumstances -- to be more fitting here.  To search the residence of a third party, like the Guerrero residence here, validly on the basis of an arrest warrant, "not only must the officers have probable cause to believe the person named in the arrest warrant is on the premises of the third person, but there must also exist an appropriate exception to the warrant requirement, *e.g.,* consent of the owner or occupier of a dwelling unit or exigent circumstances." *Wallace*, 626 F.2d at 1161. "Reasonable or probable cause to believe that a person for whom an arrest warrant has been issued is on the premises, standing alone, is not sufficient." *Id.*

Hence, to determine whether a constitutional violation occurred, the Court first inquires whether Officer Moore had a valid search or arrest warrant then explores whether there existed exigent circumstances to search the Guerrero residence in order to serve a summons for Antonia Munguia.

### 1.  Warrant

Plaintiffs state in their Complaint that what Officer Moore had with him was merely "a truancy summons for Antonia Munguia," not a warrant.  (Compl. ¶ 42.)  Plaintiffs further allege that Mrs. Guerrero did not even get to see this "truancy summons" until she was arrested and brought to the police station.  (Compl. ¶ 42.)  Defendants argue that Plaintiffs

mischaracterize the document because "both criminal and civil penalties may be imposed upon Ms. Munguia" based on this summons and that "[Officer] Moore had a duty to serve the summons . . . and if she refused such service, he had a duty to take her before the magistrate [judge]." (Defs.' Mem. in Supp. of Mot. to Dismiss or in the Alternative Summ. J. ("Defs.' Mem.") 4-5.) In support of this argument, Defendants appended a photocopy of the "Prince William Warrant Cover Sheet" and the "Summons." (Def. Mem.; Ex. A.)

The Court is mindful of the general rule that it is not to consider the documents submitted to the Court in connection with a Motion to Dismiss pursuant to Rule 12(b)(6) if they were not originally appended to the Complaint without converting the motion to a summary judgment motion with proper notice to the parties. *See Biospherics, Inc. v. Forbes, Inc.*, 989 F.Supp. 748, 749 (D. Md. 1997). However, "[a]n exception to the general rule is made for documents which are *referred to* in the Complaint and upon which Plaintiff relies in bringing the action." *Id.* (citing *Cortec Industries, Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 46-48 (2d Cir. 1991)) (emphasis added); *see also New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.*, 18 F.3d 1161, 1164 (4th Cir. 1994). Plaintiffs have raised no objection in their Opposition regarding Defendants' inclusion of the warrant cover and summons. Plaintiffs have clearly referred to this

18

document in their Complaint to state a claim against Defendants. (Compl. ¶ 42.)  Accordingly, the Court will consider Defendants' Exhibit A to rule on Defendants' Motion to Dismiss.

Liberally construing the Complaint in favor of Plaintiffs, the Court finds that Plaintiffs sufficiently alleged that Officer Moore did not have a valid arrest or search warrant when he "wedged his foot" in the Plaintiffs' door.  (Compl. ¶ 24.)  Having reviewed Exhibit A, the Court finds that the document at issue is clearly a "summons," not a warrant, asking the subject to appear before the Juvenile and Domestic Relations District Court for a "Class 3 Misdemeanor" charge for failing to assist the school in enforcing the standards of compulsory school attendance as a parent of a student enrolled in a public school. (Def.'s Mem.; Ex. A.)

Defendants argue that Officer Moore had a duty to take Antonia Munguia immediately to the magistrate judge if she refused service under Va. Ann. Code § 19.2-74(A)(3) and, accordingly, was permitted under the statute to enter the Guerrero house without a warrant for the purpose of serving a summons for a class 3 misdemeanor.  (Defs.' Mem. 4-5.)  The Court disagrees with Defendants' interpretation of the statute.  Though not binding on this Court, the Court finds the 2003 Opinion issued by the Office of the Attorney General of Commonwealth of Virginia (the "Office") and the cases cited therein to be

instructive on this very issue. *Warren v. Baskerville,* 233 F.3d 204, 207, n.2 (4th Cir. 2000) (citing *City of Virginia Beach v. Virginia Restaurant Assoc.*, 341 S.E.2d 198, 201 (1986) (holding that while the Virginia Attorney General's opinion is not binding, it provides persuasive authority entitled to due consideration)). In its Opinion No. 03-064, the Office stated that a summons that "would commence misdemeanor proceedings against the person served," is not "for all purposes, an adequate substitute for an arrest of a search warrant." 2003 Va. Op. Atty. Gen. 03-064, 2003 WL 23209766 (Va. Ag. 2003). Further, the Office noted that "[t]he issuance of a misdemeanor summons does not constitute a judicial determination that the right of privacy in a home is required to yield to an officer's purpose." *Id.* (citing *Johnson v. United States*, 333 U.S. 10, 14) (1948)). To arrive at this conclusion, the Office considered similar cases considered by other courts that held, absent exigency, "an officer may not enter private premises without a warrant in order to arrest on a charging instrument or to serve papers." *Id.*

Given the sanctity of one's home and fundamental right to be secure therein under the Fourth Amendment, the Court agrees with the 2003 Opinion issued by the Office and finds that a summons for a misdemeanor offense should not substitute for an arrest warrant, especially absent exigency. Thus, without a

valid arrest or search warrant, as in this case, Defendant officers could not enter into the home of Mr. and Mrs. Guerrero to find Antonia Munguia. Further, even if the Court were to assume for the sake of argument that the truancy summons could substitute as an arrest warrant for Antonia Munguia, the officers could not have entered the Guerrero home to arrest Antonia Munguia absent (1) probable cause to believe Antonia Munguia was on the premises of the third person; and (2) either consent of the owners or exigent circumstances. *Wallace*, 626 F.2d at 1161.

### 2. Probable Cause & Exigent Circumstances

"Although the concept of probable cause resists an exacting definition, it 'exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found' in a particular place." *United States v. Perez*, 393 F.3d 457, 461 (4th Cir. 2004) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Viewing the facts in the light most favorable to Plaintiffs, the Court does not believe that probable cause existed for Officer Moore to believe that Antonia Munguia was inside the Guerrero home. Mrs. Guerrero clearly told Officer Moore that Antonia Munguia did not live at the residence and Officer Moore never asked for Mrs. Guerrero's identification before he wedged his foot in the door. (Compl. ¶¶ 22-24.)

Next, to determine whether an exigency existed when the search commenced, the Court inquires whether the circumstances would cause law enforcement officers to form "objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992). "Exigent circumstances vary from case to case, and a determination of the issue is of necessity fact-specific." *Osabutey v. Welch*, 857 F.2d 220, 224 (4th Cir. 1988). Examples of such emergencies include, but are not limited to, "risk of danger to the police or to other persons inside or outside the dwelling." *United States v. Moses*, 540 F.3d 263, 270 (4th Cir. 2008). Viewing the alleged facts in the light most favorable to Plaintiffs, the Court finds that facts as recounted in the Complaint show that exigent circumstances did not exist for Officer Moore to wedge his foot in the doorway thereby crossing the threshold of the Guerrero home. (Compl. ¶¶ 20-24.) The Complaint shows no facts that would lead Officer Moore to reasonably believe that an emergency existed requiring an immediate entry. (Compl. ¶¶ 20-24.)

As to the unreasonable search claim alleged against Officers Potes, Hurley, and DOE, the question is a more difficult one. Plaintiffs do not allege how other officers were called to the scene. Based on the Complaint, it appears that when Officers

Potes, Hurley, and DOE came to the scene, Officer Moore was attempting to enter into the house either by pulling Mrs. Guerrero out of her house or pushing his away into the house. (Compl. ¶¶ 25-27.) Given the paucity of facts available at this stage, it is unclear whether reasonable officers would have formed "objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within" based on the circumstances. *Moss*, 963 F.2d at 678. At this stage, the Court construes the allegations in the Complaint in favor of Plaintiff and finds it premature to find the actions of Officers Potes, Hurley and DOE "objectively reasonable" without more facts.

Thus, without allegation of exigent circumstances or probable cause, the Court holds that Plaintiffs have stated valid claims against Officers Moore, Potes, Hurley and DOE for the constitutional violations of unreasonable search under the Fourth Amendment.

### ii.  Unreasonable Seizures and False Arrest and Imprisonment

In addition to their unreasonable searches claim, Plaintiffs allege in Count I that "Defendants Moore, Potes, Hurley and DOE unlawfully violated Plaintiffs' right to be free from unreasonable seizure without probable cause." (Compl. ¶ 60.) In Count III, Plaintiffs allege that Defendants Moore,

Potes, Hurley, DOEs, and ROES together falsely arrested and
imprisoned Mr. and Mrs. Guerrero.

The Supreme Court has held that the Fourth Amendment's
protection against unreasonable seizures includes seizure of the
person. *Cal. v. Hodari D.* 499 U.S. 621, 624 (1991). Defendants
do not dispute Plaintiffs' claim that Mr. and Mrs. Guerrero were
physically "seized" and formally arrested. Thus, the operative
question is whether the officers had probable cause for the
warrantless seizure and arrest of Mr. and Mrs. Guerrero. Also,
"[i]n a § 1983 action, the lawfulness of an arrest is determined
under the law of the state in which the arrest is made."
*Robinson v. Goff*, 517 F. Supp. 350, 353 (W.D. Va. 1981). In
Virginia, probable cause must justify an arrest. *Id.* Thus, an
allegation that an officer conducted a warrantless arrest without
probable cause can state a claim for false arrest and
imprisonment.[4] *See Porterfield v. Lott*, 156 F.3d 563, 568 (4th
Cir. 1998); *see also Michigan v. DeFillippo*, 443 U.S. 31, 36
(1979).

The facts, as alleged in the Complaint, state that Mrs.
Guerrero informed Officer Moore Antonia Munguia did not reside in

---

[4] The common law tort of false imprisonment is also referred to as false
arrest. *See Coughlan v. Jim McKay Chevrolet, Inc.*, 1989 WL 646497, 1 (Va.
Cir. Ct. 1989); *see also, Shiflett v. I.T.O. Corp. of Baltimore*, 2000 WL
14214, 4 n.5 (4th Cir. 2000) ("False arrest has the same elements as false
imprisonment.")

the house and tried to close the door.  (Compl. ¶ 22-24.)  She
tried to shut the door with her knee when Officer Moore wedged
his foot in the door.  (Compl. ¶ 23.)  Taken as true for the
purpose of this motion, the allegations regarding Mrs. Guerrero's
action in the Complaint could not have led Officer Moore to
believe that a crime had been or was being committed.  At most,
the facts as alleged demonstrate that Mrs. Guerrero did not want
to speak to the officer thus refused to talk to him.

Again, the question as to Officers Potes, Hurley, and
DOE is a more difficult one.  Construing the facts alleged in the
Complaint in favor of Plaintiffs, the Court is not ready to find
that Officers Potes, Hurley and DOE believed that a crime had
been or was being committed by Mrs. Guerrero when they arrived at
the scene and by Mr. Guerrero when they entered the house.  It
appears that when the officers arrived at the scene, they saw
either Officer Moore trying to push his way into the house or to
pull Mrs. Guerrero outside and possibly heard some noise from
inside the house.  (Compl. ¶ 26-27.)  Additionally, when Officers
Potes, Hurley and DOE barged in through the front door, Mr.
Guerrero was simply returning from the kitchen.  (Compl. ¶ 31.)
Based on these scant facts, the Court is hesitant to find that
probable cause existed to justify the arrest of Mr. and Mrs.
Guerrero by Officers Potes, Hurley and DOE at this stage.  For
the purpose of a motion to dismiss, these facts are sufficient to

allege that probable cause did not exist for Officers Potes, Hurley, and DOE to seize and arrest Mr. and Mrs. Guerrero. Thus, without more facts regarding probable cause, the Court holds that Plaintiffs have successfully stated valid constitutional violations of illegal seizure and false arrest and imprisonment claims to survive the motion to dismiss stage.

### iii.  Clearly Established Right

Since the Court determined above that the facts alleged by Plaintiffs "[t]aken in the light most favorable to [them,] show the [officers'] conduct violated a constitutional right," *Saucier,* 533 U.S. at 201, the Court next explores whether the violated right was clearly established at the time of the alleged violations.  *Id*. at 202.  The requirements that an officer have probable cause to seize and arrest an individual or that an officer have a warrant before entering into one's house to effectuate arrest absent consent or exigent circumstances have been clearly established constitutional law for decades. However, the Court believes that it is premature, without more fact development, to ascertain constitutionality of relevant actions of the officers on the warrantless entry into the Guerrero home to effectuate service of a truancy summons and the actions following the entry.  Thus, the Court will adopt more circumspect approach and allow Plaintiffs' claims under Count I and V to survive the motion to dismiss as alleged against

26

Officers Moore, Potes, Hurley, DOES 1-6 and ROES 1-5. The Court will revisit this issue of qualified immunity after both parties have had an opportunity to develop the relevant facts.

### b. Count II (Excessive Force)

Plaintiffs next claim that Defendants Chief Deane, Officers Moore, Potes, and ROE used excessive force when: (1) Officers Moore and Potes forcibly entered the Guerrero home knocking Mrs. Guerrero to the floor; (2) when Officer Potes pepper sprayed Mr. Guerrero; and (3) when Officers Moore instructed Officer ROE, who then complied, to tighten handcuffs on Mrs. Guerrero's wrist in the squad car on their way to the police station. (Compl. ¶¶ 63-64.)

The Complaint alleges the following: when Mrs. Guerrero tried to shut the door on Officer Moore with her right knee, he forcibly tried to push his way in thereby bruising her knee. (Compl. ¶ 24.) When he failed to push his way into the house, Officer Moore tried to drag her out of her own house by pulling her by her left arm and attempted to put her in a headlock, which caused bruising of her arm, shoulder, and right knee. (Compl. ¶ 25.) At this point, Officer Moore told Mrs. Guerrero that she was under arrest for assault and battery. (Compl. ¶ 25.) Officer Moore continued his attempt to pull Mrs. Guerrero out of her house even though she told him that her family were in the United States legally. (Compl. ¶ 27.) Finally, four officers

arrived at the scene, barged through the front door, and knocked Mrs. Guerrero to the floor causing her to hit the nearby steps which caused injuries to her left shoulder and elbow. (Compl. ¶ 31.) In addition, Officer Moore forcibly held Mrs. Guerrero to the ground after she fell. (Compl. ¶ 32.) As soon as the officers entered the home, Officer Potes sprayed Mr. Guerrero in the face with the pepper spray. (Compl. ¶ 32.) Officer Moore dragged Mrs. Guerrero out of the house and another police officer arrested Mr. Guerrero and brought him out of the house in handcuffs. (Compl. ¶ 35.) Once in the squad car on their way to the police station, Officer Moore directed a female officer in the car to tighten Mrs. Guerrero's handcuffs, and she complied. (Compl. ¶ 40.) The tightening of the handcuffs cut Mrs. Guerrero's left hand. (Compl. ¶ 40.)

When reviewing Plaintiffs' excessive force claim against an officer in accomplishing a seizure, the Court uses an "objective reasonableness" standard in analyzing the officer's action. *Graham v. Connor*, 490 U.S. 386, 388 (1989). This standard carefully balances Fourth Amendment rights "against the countervailing governmental interests at stake." *Id*. at 396. "To gauge objective reasonableness, a court examines only the actions at issue and measures them against what a reasonable police officer would do under the circumstances." *Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994). "Subjective factors

involving the officer's motives, intent, or propensities are not relevant." *Id.* at 173. Further, the "reasonableness" of a use of force is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). In making this inquiry, the Court takes into consideration that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 397. *Graham* provides three factors for the Court to consider when inquiring into the objective reasonableness: (1) "the severity of the crime"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (internal citation omitted).

> ### i. Constitutional Violation - Officer Moore and Officer ROE

First, the Court finds that the Complaint does not allege any criminal act committed by Mrs. Guerrero. Based on the allegations in the Complaint, Mrs. Guerrero was simply refusing to let a police officer into her house by attempting to close the door on him because she had already informed him that Antonia

Munguia did not live there.  (Compl. ¶ 20-24.)  The allegations
in the Complaint show that Officer Moore wedged his foot in the
doorway, continued to push his way into the house, then tried to
pull Mrs. Guerrero out of her house before informing her that she
was under arrest for assault and battery.  (Compl. ¶ 24-25.)

When the suspect has not committed a crime, the first
"objective reasonableness" factor weighs in the suspect's favor.
*Bailey v. Kennedy*, 349 F.3d 731, 743-44 (4th Cir. 2003).  There
is no indication in the Complaint that Mrs. Guerrero has
committed any crime.  The second factor also weighs in favor of
Plaintiffs because neither Officer Moore nor Officer ROE could
have perceived Mrs. Guerrero as an immediate threat based on the
facts alleged in the Complaint.  The third factor – whether the
plaintiff was resisting arrest or attempting to flee – does not
weigh in favor of either party.  Based on the allegations in the
Complaint, when Officer Moore first told her that she was under
arrest for assault and battery, it is unclear whether Mrs.
Guerrero fought Officer Moore's attempt to pull her out of the
house, thus, causing Officer Moore to call for back-up
assistance.  (Compl. ¶ 26.)  Based on these allegations, Officer
Moore may have a plausible argument that Mrs. Guerrero resisted
arrest.  However, there is no evidence of potential resistence
alleged in the Complaint after this point.  When Officer Moore
with other officers barged through the door, they caused her to

fall to the ground and hit the nearby steps. (Compl. ¶ 31.) Officer Moore forcibly held fallen Mrs. Guerrero to the ground. (Compl. ¶ 31.) In the squad car on their way to the police station, Officer Moore allegedly ordered a female officer, Officer ROE, to tighten Mrs. Guerrero's handcuffs, and she complied, even though Mrs. Guerrero never attempted to escape from the squad car. (Compl. ¶ 40.)

Balancing the three *Graham* factors based on the facts as alleged in the Complaint, the Court finds that Plaintiffs have sufficiently stated a claim against Officer Moore and Officer ROE for the unconstitutional use of excessive force. Taking all of Plaintiffs' allegations as true, the allegation that Mrs. Guerrero was not committing any crime at the time coupled with the allegedly non-threatening nature of Mrs. Guerrero's action throughout the incident outweighs the fact that she might have resisted arrest by not opening the door.

## ii. Constitutional Violation -Officer Potes

Plaintiffs allege that "[w]ithin a split second of the officers entering the house," Officer Potes sprayed Mr. Guerrero in the face with a pepper spray. (Comp. ¶ 32.) Viewing the allegations in the Complaint in the light most favorable to Plaintiffs, the excessive force claim against Officer Potes is a simpler issue. The Complaint does not allege any criminal act committed by Mr. Guerrero, nor does it allege any facts under

which Mr. Guerrero would have posed any immediate threat to the officers who entered the house. In fact, he was simply returning from the kitchen. (Compl. ¶ 31.) Also, the Complaint does not show anywhere that Mr. Guerrero tried to resist arrest or flee the sight. At this stage, the Court must construe the allegations in the Complaint in favor of Plaintiffs and finds that Plaintiffs sufficiently stated a claim of excessive force against Officer Potes.

### iii. A Clearly Established Right

The second prong of the qualified immunity analysis determines whether a reasonable officer would have known that his actions violated a clearly established right. *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727. The constitutional violation alleged by Plaintiffs – that the police officers in this case used excessive force during their arrest – is a well established and common claim. Thus, the Court finds that, at least at this early point in the litigation based on the facts as alleged in the Complaint, qualified immunity does not shield the Defendant officers from the excessive force claim under Count II.

### B. Sovereign Immunity

Defendants claim sovereign immunity as a defense against the state-law claims in the Complaint alleged against PWC, its police department, Chief Deane and the officers. (Defs.' Mem. 21.)

<u>a. Sovereign Immunity of PWC and the PWCPD</u>

Defendants argue that PWC and the PWCPD are both immune from liability for the state-law claims alleged in the Complaint based on sovereign immunity. (Defs.' Mem. 21.) In the Complaint, the only state-law claims specifically alleged against PWC and the PWCPD are Count VI (Intentional Infliction of Emotional Distress ("IIED")) and Count VII (Negligent Infliction of Emotional Distress ("NIED")). (Compl. ¶¶ 79-84.)

In Virginia, the doctrine of sovereign immunity is "alive and well." *Niese v. City of Alexandria*, 264 Va. 230, 238, 564 S.E.2d 127, 132 (Va. 2002). "[A]s a general rule, the sovereign is immune . . . from actions at law for damages . . . [I]t is plain that this protection extends to municipalities in the exercise of their governmental functions . . . one of which is certainly the maintenance of a police force." *Carter v. Morris*, 164 F.3d 215, 221 (4th Cir. 1999) (internal citations omitted). Thus, a municipality is immune from liability for the negligent acts or intentional torts of police officers under its employ that are committed during the performance of a governmental function. *Niese*, 564 S.E.2d at 132-33. This sovereign immunity extends from the municipality to the municipality's police department. *Young v. City of Norfolk*, 62 Va. Cir. 307, 2003 WL 21730724, at *2 (Va. Cir. Ct. July 17, 2003). As all of Plaintiffs' state law claims involve actions

occurred during the performance of police duties – while the
PWCPD officers were serving a truancy summons or arresting
potential criminals - PWC and the PWCPD are entitled to the
protection of sovereign immunity on all of Plaintiffs' state tort
law claims.

    b. Sovereign Immunity of Chief Deane

       Defendants also argue that Chief Deane should receive
protection of sovereign immunity against state law claims because
he meets the four-part *Messina v. Burden* test.  (Defs.' Mem. 21.)
The four *Messina* factors are as follows: (1) the nature of the
function performed; (2) the extent of the state's interest and
involvement in the function; (3) the degree of control exercised
by the state over the employee; and (4) whether the act
complained of involved the use of judgment and discretion.
*Messina v. Burden*, 228 Va. 301, 313 (1984).  Under this test, in
the absence of gross negligence or intentional misconduct,
sovereign immunity bars a state employee's liability when the
alleged violative acts involve important government functions and
the exercise of judgment and discretion.  *See Id.* at 307-08.

       Chief Deane's only role in this case, as alleged in the
Complaint, is limited to implementation of the policies and
customs within the police department and hiring, training and
supervising his subordinate officers.  (Compl. ¶ 9.)  The
Complaint does not allege any direct involvement by Chief Deane

to have committed any intentional or gross negligent torts.  Thus only potential liability he faces relates to matters implicating his discretion and judgment as a policymaker.  In this case, Chief Deane meets the *Messina* standard to receive protection of sovereign immunity.  Chief Deane serves in a high position that involves the exercise of judgment and discretion and the execution of important government functions.  Under *Messina*, sovereign immunity protects him from liability for negligence committed in the exercise of his judgment and discretion.  *See Blackburn v. Town of Coeburn*, 2007 WL 1577506, at *3 (W.D. Va. June 1, 2007).  Thus, the Court holds that sovereign immunity bars the state law claims against Chief Deane.

### c. Sovereign Immunity of Police Officers

Sovereign immunity, however, does not extend to state employees who commit *intentional torts* or gross negligence. *Elder v. Holland*, 155 S.E.2d 369, 372-73 (Va. 1967) (emphasis added); *Colby v. Boyden*, 241 Va. 125, 128, 400 S.E.2d 184, 186 (1991).  Thus, the state law claims for the intentional tort of assault and battery, false arrest and imprisonment, as well as the claim of IIED and NIED against Officers Moore, Potes, Hurley, DOES, and ROES will not be dismissed on this grounds.  *See Glasco v. Ballard*, 452 S.E.2d 854, 856 (Va. 1995) (citation omitted) (recognizing assault and battery as an intentional tort); *see*

*Schoeneman v. Fairfax County*, 37 Va. Cir. 17, 22 (Va. Cir. Ct. 1995) (recognizing false arrest and imprisonment as an intentional tort); (Compl. ¶ 83) ("Defendants' conduct . . . was intentional and/or reckless.")

## C. Contributory Negligence

Defendants submit that Mrs. Guerrero's intentional misconduct and negligence in "slamming the door" on Officer Moore and "resisting arrest" as well as Mr. Guerrero's intentional misconduct and negligence in "interfering with the arrest" bar Plaintiffs' tort recovery under the theory of contributory negligence. (Defs.' Mem. 22.) In support of this argument, Defendants cite to *Valladares v. Cordero*, 2007 U.S. Dist. LEXIS 63273 at * 18 (E.D. Va. Aug. 20 2007) in which the Court held that the doctrine of contributory negligence does not apply "where the Defendant has committed an intentional tort." (Def.'s Mem. 22.) The Court notes that all but one state-law claims alleged in the Complaint are intentional torts. *See Supra* Part B.c. Thus, the Court finds Defendants' argument untenable at this time.

## D. Other Claims in the Complaint

### a. Count III (Assault) and Count IV (Battery)

Defendants, without any support, argue in their motion that Plaintiffs' state-law assault and battery claims should be dismissed. (Defs.' Mem. 15.) "The tort of assault consists of

an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery." *Koffman v. Garnett*, 265 Va. 12, 16, 574 S.E.2d 258, 261 (Va. 2003). The intent to harm may be ascertained by the circumstances of the offense, including the actor's words and conduct. *Commonwealth v. Vaughn*, 263 Va. 31, 36, 557 S.E.2d 220, 223 (Va. 2002). Similarly, "[t]he tort of battery is an unwanted touching which is neither consented to, excused, nor justified. *Id.* (citng *Washburn v. Klara*, 263 Va. 586, 561 S.E.2d 682 (2002); *Woodbury v. Courtney,* 239 Va. 651, 391 S.E.2d 293 (1990)).

At this juncture, the Court holds that Plaintiffs have alleged sufficient facts to establish state-law claims of assault and battery against Officers Moore, Potes, DOES and ROES. Both Mrs. and Mr. Guerrero alleged that they have been wrongfully arrested and thus were unlawfully touched by the officers without their consent during and after their unlawful arrest. (Compl. ¶¶ 24-25, 27, 31, 32, 35, 40-41.) Liberally construing the Complaint in favor of Plaintiffs, the Court holds that Plaintiffs alleged sufficient facts to survive Defendants' Motion to Dismiss.

### b. Count VI: Intentional Infliction of Emotional Distress

In Count VI of the Complaint, Plaintiffs allege a

state-law claim for IIED.  (Compl. ¶¶ 79-81.)  To state an IIED claim, a plaintiff must allege and prove by clear and convincing evidence that: (1) "the wrongdoer's conduct is intentional or reckless"; (2) "the conduct is outrageous and intolerable"; (3) "the alleged wrongful conduct and emotional distress are causally connected"; and (4) "the distress is severe." *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991); *see Almy v. Grisham*, 639 S.E.2d 182, 186 (Va. 2007).  This cause of action is generally unfavored.  *Almy*, 639 S.E.2d at 187.  To elaborate further, "[l]iability [for an IIED claim] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Russo*, 400 S.E.2d at 162 (quotation omitted). "[L]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."  *Gaiters v. Lynn*, 831 F.2d 51, 53 (4th Cir. 1987). It "arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it."  *Russo*, 400 S.E.2d at 163 (citation omitted).

Though the Virginia Supreme Court has held that a plaintiff "must allege . . . all facts necessary to establish the cause of action" to establish a claim for IIED, *Almy*, 639 S.E.2d

at 187, a plaintiff before the federal court in this Circuit does not have to plead the IIED claim with the particularity required by Virginia state courts. *See Hatfill v. New York Times Co.*, 416 F.3d 320, 337 (4th Cir. 2005), cert. denied, 126 S.Ct. 1619 (2006) (finding that plaintiff had met the pleading standards in Rule 8 when he pled only "severe emotional distress"). Instead, a plaintiff merely needs to give a defendant fair notice of the claim and the grounds upon which the claim rests under Rule 8. *Id.* at 337 (citation omitted); *see Perk v. Worden*, 475 F.Supp. 2d 565, 571 (E.D. Va. 2007).

Thus, even though the bar Plaintiffs will have to meet at the summary judgment or trial stage is extremely high, in light of the relaxed pleading requirements under Rule 8, the Court rules that Plaintiffs have alleged facts sufficient to state a claim for IIED to pass muster at this juncture. Plaintiffs allege that the officers' conduct together was intentional or reckless and that their conduct could be considered outrageous and intolerable. (Compl. ¶ 80.) According to the Complaint, Officer Moore and other officers entered into Mr. and Mrs. Guerrero's home without a valid warrant and arrested Mrs. Guerrero and Mr. Guerrero in front of their children and elderly woman by knocking her down and pepper-spraying him even though there was no crime being committed. (Compl. ¶¶ 23-25, 31-36, 40-41.) The officers may have been more aggressive in

targeting and wrongfully arresting the Guerreros because they were Hispanic based on the allegations in the Complaint. (Compl. ¶ 18.) The Complaint states that the officers "caused *severe emotional distress* to the Guerrero/Munguia family" (Compl. ¶ 81) and they "suffered great shame and humiliation." (Compl. ¶ 55.) The Complaint also alleges emotional distress symptoms displayed as a result of the incident by Mr. Guerrero (Compl. ¶ 52) ("depressed for a month"), KG (Compl. ¶ 53) ("afraid"), and JG (Compl. ¶ 54) ("fearful every time [sic] he sees a police officer"). The Court finds that this is, for now, a sufficient allegation under Rule 8. *See* Fed. R. Civ. P. 8(a); *Hatfill*, 416 F.3d at 337.

Viewing the facts in the Complaint in the light most favorable to Plaintiffs, it is plausible that a jury could find such actions "outrageous and intolerable," and that they go "beyond all possible bounds of decency." *Russo*, 400 S.E.2d at 162. Given the early stage of litigation as well as fact-intensive nature of the IIED claim inquiry, the Court will reserve this claim for summary judgment or trial. The Court will not dismiss the IIED claim at this time.

### c.   Count VII: Negligent Infliction of Emotional Distress

To establish a claim of NIED, Plaintiffs must sufficiently allege the following elements to survive a Rule 12(b)(6) motion: (1) physical injury (2) proximately caused (3)

by negligent conduct (4) wantonly inflicted by defendants (5) upon plaintiff. *Shiflett v. GE Fanuc Automation Corp.,* 1996 WL 481082, 4 (W.D. Va. 1996). In *Hughes v. Moore*, 214 Va. 27, 34 (1973), the Supreme Court of Virginia held that "where conduct is merely negligent, not willful, wanton, or vindictive, and physical impact is lacking, there can be no recovery for emotional disturbance alone." The required physical injury to establish a NIED claim must be the "natural result of fright or shock proximately caused by the defendant's negligence. In other words, there may be recovery in such a case if, but only if, there is shown a clear and unbroken chain of causal connection between the negligent act, the emotional disturbance, and the *physical injury." Id.* (emphasis added). The plaintiff must put forth clear and convincing evidence of "symptoms" or "manifestations" of physical injury because symptoms of emotional disturbance alone provide no basis for recovery. *Myseros v. Sissler*, 239 Va. 8, 12, 387 S.E.2d 463, 466 (Va. 1990).

Plaintiffs allege sufficient physical injuries for Mr. and Mrs. Guerrero. (Compl. ¶ 51-52, 83.) However, the Court finds that Plaintiffs Maria Munguia and four minor children have failed to satisfy Virginia law by alleging any symptoms or manifestations of their purported physical injury caused by fright or shock. They have conclusively stated that they suffer from "sever emotional distress and physical injury." (Compl.

¶ 83.) Thus, the Court finds that the claim for NIED remains only as to Plaintiffs Mr. and Mrs. Guerrero but is dismissed relating to the rest of the Plaintiffs.

### c. Federal Claims against PWC, the PWCPD, and Chief Deane under § 1983

In *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 694 (1978), the Supreme Court established that a municipality or a local governing body may be sued for federal claims under § 1983 when unconstitutional actions are taken in the course of executing a governmental policy or custom. However if "the constitutional deprivation is not an official act of the municipality," then "recovery lies only against the officer in his official capacity." *Moultrie v. Mitchell*, 1995 WL 24891, at *1 (4th Cir., Jan. 18, 1995) (citing *Hughes v. Blankenship*, 672 F.2d 403, 405-06 (4th Cir. 1982)). Thus, if there is no evidence in the Complaint that PWC or the PWCPD "is responsible for any alleged constitutional violation or that [Plaintiffs] suffered any injury as a result of the execution of any governmental policy or custom," a dismissal is proper. *Moultrie*, 1995 WL 24891, at *2. Additionally, there is no respondeat superior liability against municipalities under § 1983. *Id.* at *1 (citing *Monell*, 436 U.S. at 694).

The Complaint contains the following allegations regarding local government policy and custom. First it states

that "PWC includes, operates, governs and is responsible for the PWCPD pursuant to the laws of Virginia and PWC." (Compl. ¶ 8.) It further states that Police Chief Deane is "responsible for policies, practices and customs within" the PWCPD. (Compl. ¶. 9.) He is "charged with hiring, screening, training, retaining, disciplining, overseeing and supervising his subordinate officers" and "for ensuring that his officers conduct themselves within the boundaries of the law." (Compl. ¶ 9.) Plaintiffs argue that these allegations are sufficient to make Chief Deane, PWC, and the PWCPD liable on each claim because "they enacted the Resolution [07-609], which in turn created an atmosphere that empowered police officers to violate constitutional rights of local Latino citizens" and "executed necessary enforcement actions that empowered police officers to violate constitutional rights of local Latino citizens." (Pls.' Opp. 19.) Plaintiffs also allege that PWC directed the PWCPD and Chief Dean to promulgate police standards in line with the Resolution. (Compl. ¶ 17.)

While the allegations of policy and custom related to the Section 1983 claims under Count I and II in the Complaint are quite conclusory, the Court finds that they are sufficient to survive the motion to dismiss the stage so long as no other immunity or pleading failure bars the claims.

<u>i. Liability of the PWCPD</u>

In the Complaint, Plaintiffs have alleged that the PWCPD's policies were responsible for the Section 1983 violations. (Compl. ¶ 17.) The Court, however, notes that "in Virginia, an operating division of a governmental entity cannot be sued unless the legislature has vested the operating division with the capacity to be sued." *Muniz v. Fairfax County Police Dept.*, 2005 WL 1838326, at *2 (E.D. Va. Aug. 2, 2005) (citing *Davis v. City of Portsmouth*, 579 F. Supp. 1205, 1210 (E.D. Va. 1983), *aff'd* 742 F.2d 1448 (4th Cir. 1984)); *see also Mobley v. City of Chesapeake*, 2006 WL 4738661, at *3 (E.D. Va. Aug. 30, 2006); *Young,* 2003 WL 21730724, at *2. Because the PWCPD exists as merely an arm of Prince William County as a department of the government without capacity to be sued separately, Va. Code Ann. § 15.2-821, the Court will dismiss the federal claims brought under § 1983 against the PWCPD.

<u>ii. Liability of Chief Deane – Official Capacity</u>

The Court holds that Plaintiff has alleged sufficient § 1983 federal claims against Chief Deane in official capacity based on policies and procedures that might have led to constitutional violations. Thus, the Court will not dismiss the § 1983 claims against Chief Deane in his official capacity for Counts I and II.

### iii. Liability of Chief Deane – Personal Capacity

"[T]o establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *McDonald v. Dunning,* 760 F.Supp. 1156, 1160 (E.D. Va. 1991) (citing *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105 (1985)).  Thus, suits against government agents in their individual capacity "cannot succeed absent proof of some degree of *personal* involvement in the alleged deprivation of rights." *McDonald*, 760 F.Supp. at 1160 (internal citations omitted) (emphasis added).  Plaintiffs allege that Chief Deane "is responsible for policies, practices and customs within" the PWCPD and that he "is charged with hiring, screening, training, retaining, disciplining, overseeing, and supervising his subordinates."  (Compl. ¶ 9.)  He is "also responsible for ensuring that his officers conduct themselves within the boundaries of the law."  (Compl. ¶ 9.)

Plaintiffs do not allege anywhere in the Complaint that Chief Deane was *personally* involved in the alleged constitutional violations committed by Defendant officers.  Plaintiffs' counsel submitted during the oral argument that Chief Deane is personally liable based on a supervisory liability theory.  Thus, the Court will analyze the Complaint to determine whether it states a personal capacity claim against Chief Deane under a supervisory

liability theory.

Viewing the allegations in the Complaint in the light
most favorable to Plaintiffs, it does not appear that the
Complaint establishes a cause of action for supervisory
liability.  In the Fourth Circuit, a claim for supervisory
liability requires the following: (1) "actual or constructive
knowledge of a risk of constitutional injury"; (2) "deliberate
indifference to that risk"; and (3) "an affirmative causal link
between the supervisor's inaction and the particular
constitutional injury suffered by the plaintiff."  *Carter*, 164
F.3d at 221 (citation and quotation omitted).  Where supervisor's
"corrective inaction amounts to deliberate indifference or tacit
authorization" of "a pervasive and unreasonable risk of harm from
some specified source," they can be held liable personally.  *Id.*
at 220 (citation and quotation omitted).  Lastly, a supervisory
liability claim, as with municipal liability, cannot rest on the
theory of respondeat superior.  *Id.*

The Complaint is devoid of specific allegations about
Chief Deane's actual or constructive knowledge regarding a risk
of constitutional injury.  Chief Deane had no interaction with
Plaintiffs and his only involvement in the alleged constitutional
violations was promulgation of police department policies that
was in line with the resolution passed by PWC Board of
Supervisors.  This is simply inadequate to state a claim for

supervisory liability.  The Complaint contains no allegations of prior bad acts on the part of Defendant officers from which "a pervasive and unreasonable risk of harm" could have been observed by Chief Deane.  *See id.*  Nothing in the Complaint suggests that Chief Deane was indifferent to the risk of constitutional violations.  The Court will dismiss all claim against Chief Deane in his personal capacity.

## IV.  Conclusion

For these reasons, the Court will grant in part and deny in part Defendants' Motion to Dismiss.

To summarize the Court's findings: (1) Count I, for unreasonable search and seizure, against PWC, Chief Deane in official capacity, and Officers Moore, Potes, Hurley and DOE, will not be dismissed; (2) Count II, for excessive force, against Chief Deane in official capacity and Officers Moore, Potes, and ROE will not be dismissed; (3) Count III, for assault, against Officers Moore, Potes, DOE, and ROE, will not be dismissed; (4) Count IV, for battery, against Officers Moore, Potes, and ROE, will not be dismissed; (5) Count V, for false arrest and imprisonment, against Officers Moore, Potes, Hurley, DOES and ROES will not be dismissed; (6) Count VI, for intentional infliction of emotional distress, against Officers Moore, Potes, Hurley, DOES and ROES will not be dismissed; (7) Count VII, for negligent infliction of emotional distress, against Officers

47

Moore, Potes, Hurley, DOES and ROES, will be dismissed only as it relates to injuries suffered by Maria Munguia and JJG, MG, KG, and JG, but not as to injuries suffered by Mr. and Mrs. Guerrero; (8) all federal claims against the PWCPD will be dismissed; (9) all claims against Chief Deane in his personal capacity will be dismissed; (10) all claims against Chief Deane in his official capacity, except those for Counts I-II, will be dismissed; and (11) PWC, the PWCPD, and Chief Deane all have sovereign immunity against Plaintiffs' state law claims.

An appropriate Order will issue.

February 19, 2010                    /s/
Alexandria, Virginia        _____
                                 James C. Cacheris
                         UNITED STATES DISTRICT COURT JUDGE